## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LAZEMA JOHNSON, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>NUANCE COMMUNICATIONS, INC.,<br><br>    Defendant. | Case No. 1:23-cv-12265<br><br> **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Lazema Johnson ("Plaintiff"), by her undersigned counsel, files this Class Action Complaint, individually and on behalf of a class of all similarly situated persons, against Defendant Nuance Communications, Inc. ("Nuance" or "Defendant"). Plaintiff alleges as follows based upon personal knowledge as to her own acts and otherwise on information and belief and the investigation of counsel:

## <u>NATURE OF THE ACTION</u>

1.      Companies that handle sensitive, personally identifying information ("PII") or protected health information ("PHI") owe a duty to the individuals to whom that data relates. This duty arises because it is foreseeable that the exposure of PII or PHI to unauthorized persons—especially to hackers with nefarious intentions—will result in harm to the affected individuals, including, but not limited to, the invasion of their private financial and health matters and the use of that information by nefarious actors to the individuals' detriment.

2.      The harm resulting from a data and privacy breach manifests in myriad ways, including identity theft and financial fraud, and the exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their

1

lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take a number of additional cumbersome cautionary measures.

3.     Defendant Nuance is a Massachusetts-based software technology corporation that sells artificial intelligence and voice recognition software. In 2019, Nuance pivoted its business model to focus primarily on healthcare technology applications.[1] While Nuance still markets and sells to client entities across industries, its primary focus has been on the healthcare sector.

4.     Nuance is used by 90% of hospitals and 10,000 healthcare organizations worldwide.[2] Within the United States, four out of five healthcare organizations nationwide use Nuance technology.[3] Across these organizations, Nuance claims to transmit over 300 million "patient stories" (*e.g.*, radiology reports, clinician documentation of appointments) each year.[4]

5.     These "patient stories" inherently involve personal information gathered from those millions of patients. As the business associate of healthcare providers, Nuance knowingly obtains sensitive patient PII and PHI and has a resulting duty to securely maintain such information in confidence.

6.     Nuance expressly recognizes this duty to securely maintain individuals' PII and PHI in confidence. In its Privacy Policy Nuance states: "We follow generally accepted standards

---

[1] *Nuance and Microsoft Partner to Transform the Doctor Patient Experience*, Nuance (Oct. 17, 2019), https://news.nuance.com/2019-10-17-Nuance-and-Microsoft-partner-to-transform-the-doctor-patient-experience.

[2] *Healthcare AI Solutions & Services*, Nuance, https://www.nuance.com/en-ie/healthcare.html (last visited Sept. 29, 2023).

[3] *Id.*

[4] *Fact Sheet: Nuance Healthcare by the Numbers*, Nuance (2022), https://www.nuance.com/asset/en_us/collateral/healthcare/fact-sheet/fs-nuance-healthcare-fact-sheet-en-us.pdf (last visited Sept. 29, 2023).

to protect the personal data submitted to us, both during transmission and once it is received."[5] Nuance's HIPAA Privacy Policy further states that "Nuance embraces a holistic approach to securing patient data within our custody."[6] The current Business Associate Agreement as posted on Nuance's website promise its customers that Defendant will " use appropriate safeguards . . . with respect to electronic protected health information, to prevent use or disclosure of PHI other than as provided for by this BA Agreement."[7]

7.     Despite Nuance's duty to safeguard its customers' PII and PHI, Plaintiff's and other individuals' PII and/or PHI was exfiltrated by an unauthorized third party during a massive data breach that occurred on or about May 28-29, 2023 (the "Data Breach"). The Data Breach exploited a vulnerability in a software technology called MOVEit, which is used by Nuance in its regular conduct of business.

8.     While Nuance learned of the Data Breach on May 31, 2023, Nuance did not notify individuals impacted by the Data Breach until on or about September 18, 2023—approximately four months after the incident occurred and Nuance was made aware of the Data Breach.[8]

9.     Based on the public statements of Nuance to date, a wide variety of PII and PHI was implicated in the Data Breach, including but not limited to individuals' names, birth dates, medical record numbers, gender, demographic information, information about medical studies received, medical practitioners' names, descriptions of medical services rendered, diagnoses,

---

[5] *Privacy Policy*, NUANCE, https://www.nuance.com/en-ie/about-us/company-policies/privacy-policies.html (last visited Sept. 29, 2023).
[6] *Global Privacy - HIPAA Requirements*, NUANCE, https://www.nuance.com/about-us/trust-center/privacy/hipaa.html (last visited Sept. 29, 2023).
[7] *Business Associate Agreement*, NUANCE, https://www.nuance.com/about-us/terms-and-conditions/previous-versions/business-associate-agreement-20200624.html (last visited Sept. 29, 2023).
[8] Letter from Umar Waheed, Chief Info. Sec. Officer, Nuance Commc'ns, Inc., to Lazema Johnson (Sept. 18, 2023), attached as **Exhibit A**.

medication information, health care plan subscriber identification numbers, email addresses, phone numbers, relatives' names, and power of attorneys' names.[9]

10.    As a direct and proximate result of Nuance's failure to implement and follow basic security procedures, Plaintiff's and Class Members' PII and PHI is now in the hands of cybercriminals.

11.    Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, and similar forms of criminal mischief—risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

12.    Plaintiff, on behalf of herself and all others similarly situated, brings claims for negligence, unjust enrichment, and declaratory judgment, seeking damages and injunctive relief.

## PARTIES

13.    Plaintiff Lazema Johnson is an adult who, at all relevant times, is a resident and citizen of the Commonwealth of Pennsylvania. Plaintiff was a patient at Temple University Health System, a system that uses Nuance software. Plaintiff received a Data Breach Notification informing her that her PII and PHI in Nuance's possession had been compromised during the Data Breach.

14.    Defendant Nuance Communications, Inc., is a for-profit Delaware corporation with its principal place of business at 1 Wayside Road, Burlington, Massachusetts 01803. Defendant is a citizen of the state of Delaware and the Commonwealth of Massachusetts.

---

[9] *Id.*; Jill McKeon, *Nuance Communications Notifies 1.2M Individuals of Data Breach*, HEALTH IT SEC. (Sept. 25, 2023), https://healthitsecurity.com/news/nuance-communications-notifies-1.2m-individuals-of-data-breach.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §

1332(d), the Class Action Fairness Act, which affords federal courts with original jurisdiction over

cases where any member of the plaintiff class is a citizen of a state different from any defendant,

and where the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Here,

Plaintiff is diverse from Defendant because Plaintiff resides in Pennsylvania, while Defendant

resides in Massachusetts and Delaware, where it is headquartered and incorporated, respectively.

Plaintiff alleges that, in the aggregate, the claims of all putative class members exceed $5,000,000,

exclusive of interest and costs.

16.     This Court has general personal jurisdiction over Defendant because it is

headquartered in Burlington, Massachusetts and is registered to conduct business in

Massachusetts.

17.     This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391 because

a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in

Massachusetts and Defendant resides in this District.

## FACTUAL BACKGROUND

**A.     Nuance Collected and Stored Plaintiff's and Class Members' Valuable PII and PHI in the Course of Providing Its Services.**

18.     Defendant Nuance provides artificial intelligence ("AI") software to healthcare

providers across the United States and around the world. Nuance technology is used by 90% of

hospitals and 10,000 healthcare organizations worldwide, and four out of five healthcare

organizations within the United States.[10] The AI technology sold by Nuance includes transcription services, diagnostic analytics, document capture, speech recognition, and more.[11]

19.     Upon information and belief, while administering its healthcare technology services, Nuance receives, maintains, and handles PII and PHI from its client healthcare providers, which includes, *inter alia*, names, birth dates, medical record numbers, gender, demographic information, information about medical studies received, medical practitioners' names, descriptions of medical services rendered, diagnoses, medication information, health care plan subscriber identification numbers, email addresses, phone numbers, relatives' names, and power of attorneys' names.

20.     Upon information and belief, because Nuance receives, maintains, and handles PII and PHI from healthcare providers, Defendant qualifies as a business associate within the meaning of 45 C.F.R. § 160.103(3) and has therefore entered into Business Associate Agreements with its client healthcare providers, becoming a custodian of patient PHI.

21.     Nuance's status as a business associate is further supported by the up-to-date "HIPAA Business Associate Agreement" as posted on its website, in which Nuance refers to itself as "Business Associate.".[12]

22.     As a business associate of its client healthcare providers, Nuance is a covered entity under the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1302d, *et seq*.

---

[10] *Healthcare AI Solutions & Services*, *supra* note 2.
[11] *Id.*
[12] *Business Associate Agreement, supra* note 7.

23.    Plaintiff and Class Members directly or indirectly entrusted Nuance with their sensitive and confidential PII and PHI and therefore reasonably expected that Defendant would safeguard their highly sensitive information and keep their PHI confidential.

24.    As a custodian of Plaintiff's and Class Members' PII and PHI, Nuance assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

25.    Despite Nuance's duty to safeguard Plaintiff's and Class Members' PII and PHI, Nuance nevertheless employed inadequate data security measures to protect and secure the data with which it was entrusted, resulting in the Data Breach and the subsequent compromise of Plaintiff's and Class Members' PII and PHI.

**B.    Nuance Knew the Risks of Storing Valuable PII and PHI and the Foreseeable Harm to Victims in the Case of a Data Breach.**

26.    Nuance was wholly aware that the PHI and PII that it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

27.    Nuance also knew that a breach of its systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII and PHI was compromised, as well as intrusion into their highly private health information.

28.    PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce." PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

29.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[13]

30.     In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[14]

31.     The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[15]

32.     Additionally, "[h]ospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it on easily – making the industry a growing target."[16]

33.     Indeed, cybercriminals seek out PHI at a greater rate than other sources of personal information. In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700 of the

---

[13]   *Data Breach Report: 2021 Year End*, RISK BASED SECURITY (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/.

[14]   *Insurance Information Institute, Facts + Statistics: Identity Theft and Cybercrime*, INSURANCE INFORMATION INSTITUTE, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited Sept. 29, 2023).

[15]   *The Healthcare Industry is at Risk*, SWIVELSECURE https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited Sept. 29, 2023).

[16]   *Id.*

2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[17]

34.    The healthcare sector suffered about 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July. The percentage of healthcare breaches attributed to malicious activity rose more than 5 percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[18]

35.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves the patients of the healthcare providers using Nuance especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

36.    As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[19] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[20]

37.    According to Experian:

---

[17] *2022 Breach Barometer*, Protenus, https://www.protenus.com/breach-barometer-report (last visited Sept. 29, 2023).

[18] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Health IT Sec.,(July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year.

[19] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[20] *Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers (PWC) (Sept. 30, 2014), https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.

ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.

Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[21]

38.    According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[22]

39.    Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII and PHI

---

[21] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[22] U.S. GOV'T ACCOUNTABILITY OFF., GAO-07-737, DATA BREACHES & IDENTITY THEFT (2007).

about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

40.    Based on the value of PII and PHI to cybercriminals, Nuance certainly knew the foreseeable risk of failing to implement adequate cybersecurity measures.

**C.    Nuance Breached its Duty to Safeguard Individuals' PII and PHI.**

41.    Nuance engaged Progress Software Corporation to provide it with secure file transfer software—MOVEit. Upon information and belief, Nuance utilizes MOVEit software and on-premises hardware to exchange patient files related to the clinical documentation services provided to its client healthcare providers. By using on-premises MOVEit hardware, Nuance had physical control over the server that was compromised at the time of the Data Breach.

42.    Beginning on or around May 27, 2023 the notorious CL0P ransomware gang exploited a vulnerability in the MOVEit software and accessed, copied, and stole Plaintiff's and Class Members' PII and PHI.[23] The vulnerability allowed CL0P to escalate user privileges and gain unauthorized access to customer environments.[24] Following the discovery of the initial vulnerability in the file transfer software, additional vulnerabilities were subsequently discovered.[25]

43.    Inexplicably, and inexcusably, Plaintiff was not informed that her data was breached until several months later, on or about mid-September, 2023.

---

[23]    #StopRansomware: CL0P Ransomware Gang Exploits CVE-2023-34362 MOVEit Vulnerability, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY (June 7, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-158a.
[24]    Matt Kapko, *MOVEit Mass Exploit Timeline: How the File-Transfer Services Attacks Entangled Victims*, CYBERSECURITY DIVE (Sept. 25, 2023), https://www.cybersecuritydive.com/news/moveit-breach-timeline/687417/.
[25]    *Id.*

44.     However, investigations following CL0P's exploitation of the MOVEit vulnerability have subsequently revealed that CL0P had known about this particular vulnerability and had been experimenting with ways to exploit as far back as 2021.[26]

45.     Indeed, one security firm's review of "logs of impacted [MOVEit] clients found evidence of similar [malicious] activity occurring in multiple client environments last year (April 2022) and in some cases as early as July 2021."[27]

46.     The security firm "also discovered the threat actors were testing ways to collect and extract sensitive data from compromised MOVEit Transfer servers as far back as April 2022, likely with the help of automated tools."[28]

47.     As such, the 2022 activity and "[t]he malicious activity appeared to be aimed at exfiltrating Organization IDs ("Org IDs") which identified specific MOVEit Transfer users and would have helped Clop determine which organizations it could access."[29]

48.     According to Nuance, it first became aware of the Data Breach on or around May 31, 2023. After becoming aware of the Data Breach, Nuance conducted an investigation which determined that patient information had been compromised during the Data Breach.[30]

---

[26] Laurie Iacono et al., *Clop Ransomware Likely Sitting on MOVEit Transfer Vulnerability (CVE-2023-34362) Since 2021*, KROLL (June 8, 2023), https://www.kroll.com/en/insights/publications/cyber/clop-ransomware-moveit-transfer-vulnerability-cve-2023-34362.

[27] Sergiu Gatlan, *Clop Ransomware Likely Testing MOVEit Zero-Day Since 2021*, BLEEPING COMPUTER (June 8, 2023), https://www.bleepingcomputer.com/news/security/clop-ransomware-likely-testing-moveit-zero-day-since-2021/

[28] *Id.*

[29] Simon Hendery, *Ransomware Gang Clop Prepped Zero-Day MOVEit Attacks in 2021*, SC MAGAZINE (June 9, 2023), https://www.scmagazine.com/news/ransomware-gang-clop-zero-day-moveit-2021.

[30] McKeon, s*upra* note 9.

49.     A wide variety of patient information was compromised during the Data Breach, including patients' names, demographic information, names of relatives, dates of service, medical facility information, practitioner's name, health insurance numbers, medication information, diagnoses, and patient identifiers.[31]

50.     Since the Data Breach, CL0P has begun leaking information exfiltrated from Nuance. A review of CL0P's leak cite reveals that the cybercriminals have begun leaking what they describe Part 1 of 50 parts of data from Nuance.[32]

51.     Nuance has reported the data breach the United States Department of Health and Human Services Office for Civil Rights ("HHS"), indicating that approximately 1.2 million individuals were impacted by the Data Breach.[33]

52.     Upon information and belief, the Data Breach occurred as a direct result of Nuance's failure to implement and follow basic data security procedures in order to protect individuals' PII and PHI. Nuance could have prevented the Data Breach, or substantially mitigated its severity, if it had properly screened its data vendors or contractors, such as Progress Software for cybersecurity standards as well as conducted cybersecurity audits of its contractors and vendors.

**D.     At All Relevant Times, Nuance Had a Duty to Properly Secure Personal Information.**

53.     At all relevant times, Nuance had a duty to Plaintiff and Class Members to properly secure their PII, encrypt and maintain such information using industry standard methods, train its

---

[31] *Id.*

[32] *More Victims of MOVEit Breach are Revealed: Nuance Discloses for Covered Entities*, DATABREACHES.NET (Sept. 18, 2023), https://www.databreaches.net/more-victims-of-moveit-breach-are-revealed-nuance-discloses-for-covered-entities/.

[33] *Breach Report*, U.S. DEP'T HEALTH HUM. SERVS. OFF. FOR CIV. RTS., https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited Sept. 29, 2023).

employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiff and Class Members, and to promptly notify Plaintiff and Class Members when Nuance became aware that their PII was compromised.

54.    Nuance had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, Nuance breached its common law, statutory, and other duties owed to Plaintiff and Class Members.

55.    Security standards commonly accepted among businesses that store PII and PHI accessible to the internet include, without limitation:

  a. Maintaining a secure firewall configuration;

  b. Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

  c. Monitoring for suspicious or irregular traffic to servers;

  d. Monitoring for suspicious credentials used to access servers;

  e. Monitoring for suspicious or irregular activity by known users;

  f. Monitoring for suspicious or unknown users;

  g. Monitoring for suspicious or irregular server requests;

  h. Monitoring for server requests for PII and PHI;

  i. Monitoring for server requests from VPNs; and

  j. Monitoring for server requests from Tor exit nodes.

56.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[34]

---

[34] 17 C.F.R. § 248.201 (2013).

The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[35]

57.    The ramifications of Nuance's failure to keep consumers' PII secure are long lasting and severe.  Once PII is stolen, fraudulent use of that information and damage to victims including Plaintiff and the Class may continue for years.

**E.    Nuance is Obligated Under HIPAA to Safeguard Personal Information.**

58.    Upon information and belief, Nuance is a business associate of healthcare providers and is therefore required by HIPAA to safeguard patient PHI.

59.    As an entity covered by HIPAA, Nuance is required to comply with HIPAA, which sets minimum federal standards for privacy and security of PHI.

60.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information" from covered entities as well as their business associates. 45 C.F.R. § 164.302.

61.    Under 45 C.F.R. §160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media;" "[m]aintained in electronic media;" or "[t]ransmitted or maintained in any other form or medium."

62.    Under 45 C.F.R. § 160.103, HIPAA defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2)"[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an

---

[35] *Id.*

individual;" and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual."

63.    Under 45 C.F.R. § 164.306, covered entities and business associates alike must meet certain general security standards in order to reduce risk and "[e]nsure the confidentiality, integrity, and availability of all electronic protected health information the . . . business associate creates, receives, maintains, or transmits."

64.    HIPAA requires Nuance to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et seq*.

65.    The HHS further recommends the following data security measures a business associate such as Nuance should implement to protect against some of the more common, and often successful, cyber-attack techniques. According to those guidelines, business associates should:

      a.    Implement security awareness and training for all workforce members and that the training programs should be ongoing, and evolving to be flexible to educate the workforce on new and current cybersecurity treats and how to respond;

      b.    Implement technologies that examine and verify that received emails do not originate from known malicious site, scan web links or attachments included in emails for potential threats, and impeded or deny the introduction of malware that may attempt to access PHI;

    c.      Mitigate known data security vulnerabilities by patching or upgrading vulnerable technology infrastructure, by upgrading or replacing obsolete and/or unsupported applications and devices, or by implementing safeguards to mitigate known vulnerabilities until an upgrade or replacement can occur;

    d.      Implement security management processes to prevent, detect, contain, and correct security violations, including conducting risk assessments to identify potential risks and vulnerabilities to the confidentiality, integrity, and availability of PHI; and

    e.      Implement strong cyber security practices by requiring strong passwords rules and multifactor identification.[36]

66.    Upon information and belief, Nuance failed to implement one or more of the recommended data security measures.

67.    While HIPAA permits healthcare providers and their business associates to disclose PHI to third parties under certain circumstances, HIPAA does not permit healthcare providers and their business associates to disclose PHI to cybercriminals nor did Plaintiff or the Class Members consent to the disclosure of their PHI to cybercriminals.

68.    As such, Nuance is required under HIPAA to maintain the strictest confidentiality of Plaintiff's and Class Members' PHI that it acquires, receives, and collects, and Nuance is further required to maintain sufficient safeguards to protect that information from being accessed by unauthorized third parties.

---

[36] *OCR Quarter 1 2022 Cybersecurity Newsletter*, U.S. DEP'T HEALTH HUM.SERVS., (Mar. 17, 2022), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity-newsletter-first-quarter-2022/index.html.

69.     Given the application of HIPAA to Nuance, and that Plaintiff and Class Members directly or indirectly entrusted their PHI to Nuance, Plaintiff and Class Members reasonably expected that Nuance would safeguard their highly sensitive information and keep their PHI confidential.

**F.     FTC Guidelines Prohibit Nuance from Engaging in Unfair or Deceptive Acts or Practices.**

70.     Nuance is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

71.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[37]

72.     The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[38]

73.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity

---

[37] *Start with Security – A Guide for Business*, U.S. FED. TRADE COMM'N (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[38] *Protecting Personal Information: A Guide for Business*, U.S. FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

on the network; and verify that third-party service providers have implemented reasonable security measures.[39]

74.     The FTC has brought enforcement actions against businesses for failing to protect customer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

75.     Nuance was at all times fully aware of its obligations to protect the PII and PHI of patients because of its position as a business associate of healthcare providers, which gave it direct access to reams of patient PII and PHI from its clients. Nuance was also aware of the significant repercussions that would result from its failure to do so.

76.     Despite its obligations, Nuance failed to properly implement basic data security practices, and Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII and PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

**G.     Plaintiff and Class Members Suffered Damages.**

77.     For the aforementioned reasons, Nuance's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways.

78.     Plaintiff and Class Members must immediately devote time, energy, and money to: 1) closely monitor their medical statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications

---

[39] *Id.*

to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

79.     Once PII and PHI is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Nuance's conduct. Further, the value of Plaintiff and Class Members' PII and PHI has been diminished by its exposure in the Data Breach.

80.     As a result of Nuance's failures, Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their PII and PHI.

81.     As found in a recent study, 28% of consumers affected by a data breach become victims of identity fraud—this is significantly higher than the risk calculated in 2012 (finding that 9.5% of those affected by a breach would be subject to identity fraud), and higher still than the likelihood of identity fraud in the absence of a data breach (a mere 3%).[40]

82.     With respect to health care breaches, another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[41]

83.     "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's

---

[40] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KNOWBE4 (Sept. 29, 2023), https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud.
[41] Jessica David, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, HEALTH IT SEC. (Sept. 25, 2019), https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.

utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[42]

84.    The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[43]

85.    Health information in particular is likely to be used in detrimental ways—by leveraging sensitive personal health details and diagnoses to extort or coerce someone—and for serious and long-term identity theft.[44]

86.    "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[45]

87.    Plaintiff and Class Members are also at a continued risk because their information remains in Nuance's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its patients' PII and PHI.

88.    Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers.

---

[42] *Id.*
[43] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.
[44] *Id.*
[45] *The Potential Damages and Consequences of Medical Identity theft and Healthcare Data Breaches*, EXPERIAN (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited Sept. 29, 2023).

**H.    Plaintiff's Experience.**

89.    Plaintiff is a Pennsylvania resident who was a patient at Temple University Health System, a system that uses Nuance software. On or about September 18, 2023, Plaintiff received a letter informing her that her PII and PHI in Nuance's possession had been compromised during the Data Breach.

90.    Nuance uses the MOVEit technology to handle patients' sensitive information, including Plaintiff's PII and PHI. Plaintiff reasonably expected that her highly personal information would remain safeguarded and would not be accessible by unauthorized parties.

91.    Nuance has not provided Plaintiff with any remedial measures. Instead, Nuance put the burden on Plaintiff to prevent future issues of her PII and PHI compromised in the Data Breach, informing Plaintiff to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and to monitor your free credit reports for suspicious activity and to detect errors."

92.    Plaintiff has suffered actual injury from having her sensitive information exposed and/or stolen as a result of the Data Breach, including (1) required mitigation efforts, including needing to monitor her various accounts to ensure information is not being used for identity theft and fraud; (b) damages and diminution of the value of her sensitive information, a form of intangible property that loses value when it falls into the hands of criminals who are suing that information for fraud or publishing the information for sale on the dark web; (c) loss of privacy; (d) continuous imminent and depending injury arising from the increased risk of medical identity theft and fraud; and (e) time and expense of migration efforts required as a result of the Data Breach.

93.    In addition, knowing that hackers accessed and exfiltrated her sensitive information and that this likely has been and will be used in the future for identity theft, fraud, and related purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

## CLASS ALLEGATIONS

94.    Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following class:

> All individuals in the United States and its territories whose PII and/or PHI was compromised in the Nuance Data Breach announced on or about September 15, 2023 (the "Class").

95.    Excluded from the Class is Defendant, its subsidiaries and affiliates, its officers, directors and members of their immediate families and any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

96.    This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when she moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

97.    **Numerosity**: Plaintiff is informed and believes, and thereon alleges, that there are at minimum, hundreds of thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Nuance's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes approximately 1.2 million individuals.

98.    **Commonality**: This action involves questions of law and fact common to the Class. Such common questions include but are not limited to:

a.    Whether the Defendant knew or should have known that its data environment and cybersecurity measures created a risk of a data breach;

b.    Whether the Defendant controlled and took responsibility for protecting the Plaintiff's and the Class's data when it stored that data on its servers;

c.    Whether the Defendant's security measures were reasonable in light of the recommendations of the HHS, the FTC data security recommendations, state laws and guidelines, and common recommendations made by data security experts;

d.    Whether the Defendant owed the Plaintiff and the Class a duty to implement reasonable security measures;

e.    Whether the Defendant's failure to adequately secure the Plaintiff's and the Class's data constitutes a breach of its duty to institute reasonable security measures;

f.    Whether the Defendant's failure to implement reasonable data security measures allowed the breach of its data systems to occur and caused the theft of the Plaintiff's and the Class's data;

g.    Whether reasonable security measures known and recommended by the data security community could have prevented the breach;

h.    Whether the Plaintiff and the Class were injured and suffered damages or other losses because of the Defendant's failure to reasonably protect its data systems; and

i.      Whether the Plaintiff and the Class are entitled to relief.

99.    **Typicality**: Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Defendant was the custodian of Plaintiff's and Class Members' PII and PHI, when their PII and PHI was obtained by an unauthorized third party.

100.    **Adequacy of Representation**: Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

101.    **Superiority**: This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

102.    **Predominance**: Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class.

If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

103.    **Injunctive Relief**: Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

104.    **Ascertainability**: Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Nuance's books and records.

<u>**CLAIMS FOR RELIEF**</u>

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

105.    Plaintiff restates and realleges the foregoing allegations as if fully set forth herein.

106.    Plaintiff brings this claim individually and on behalf of the Class.

107.    Nuance owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII and PHI in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Nuance's duty to use reasonable care arose from several sources, including but not limited to those described below. Nuance had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By receiving, maintaining, and handling PII and PHI that is routinely targeted by criminals for unauthorized access, Nuance was obligated to act with reasonable care to protect against these foreseeable threats. Furthermore, Nuance knew or should have known that, if hackers accessed the sensitive

data contained in its data systems, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and the harm it caused Plaintiff and the Class, was the foreseeable consequence of Defendant's unsecured, unreasonable data security measures.

108.    Nuance's duty also arose from its position as a business associate. Nuance holds itself out as a trusted business associate of healthcare providers, and thereby assumes a duty to reasonably protect the information it obtains from those healthcare providers. Indeed, Nuance, which receives, maintains, and handles PII and PHI from its client healthcare providers, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

109.    Additionally, Section 5 of the FTC Act required Defendant to take reasonable measures to protect Plaintiff's and the Class's sensitive data and is a further source of Defendant's duty to Plaintiff and the Class. Section 5 of the FTC Act prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendant of failing to use reasonable measures to protect highly sensitive data. Therefore, Defendant was required and obligated to take reasonable measures to protect data it possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of Defendant's duties to adequately protect sensitive information. By failing to implement reasonable data security measures, Defendant acted in violation of Section 5 of the FTC Act.

110.    Similarly, HIPAA is a further source of Defendant's duty to Plaintiff and the Class, as HIPAA required Nuance to take reasonable measures to protect Plaintiff's and the Class's sensitive data. Indeed, HIPAA required Nuance to: (a) ensure the confidentiality, integrity, and

availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et seq*. By failing to implement reasonable data security measures, Defendant acted in violation of HIPAA.

111.    Nuance breached the duties owed to Plaintiff and Class Members and thus was negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiff at this time, on information and belief, Nuance breached its duties through some combination of the following errors and omissions that allowed the data compromise to occur: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its patients; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

112.    But for Nuance's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised.

113.     As a direct and proximate result of Nuance's negligence, Plaintiff and Class Members have suffered injuries, including:

     a.     Theft of their PII and/or PHI;

     b.     Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

     c.     Costs associated with purchasing credit monitoring and identity theft protection services;

     d.     Lowered credit scores resulting from credit inquiries following fraudulent activities;

     e.     Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

     f.     The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

     g.     Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Nuance with the mutual understanding that Nuance would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.    Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Nuance's possession and is subject to further breaches so long as Nuance fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i.    Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class members.

114.    As a direct and proximate result of Nuance's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

115.    Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

116.    Plaintiff brings this claim individually and on behalf of the Class.

117.    Because of its wrongful acts and omissions described herein, Defendant has obtained a benefit by unduly taking advantage of Plaintiff and Class Members.

118.    Plaintiff and Class Members have an interest, both equitable and legal, in the PII and PHI about them that was conveyed to, collected by, and maintained by Nuance and that was ultimately accessed or compromised in the Data Breach.

119.    Plaintiff and Class Members conferred a benefit on Nuance in the form of valuable, personal, confidential information. Nuance's business model would not exist save for the need to securely transmit patient information on behalf of its client healthcare providers.

120.    The relationship between Nuance and Plaintiff and Class Members is not attenuated, as Plaintiff and Class Members had a reasonable expectation that the security of their PII and PHI would be maintained when they provided their information to Nuance's client healthcare providers.

121.    Nuance accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members.

122.    Nuance appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Upon information and belief, this financial benefit was, in part, conferred, when Nuance was paid by its customers, as its client healthcare providers, to provide its customers with its services. Nuance also benefited from the receipt of Plaintiff's and Class Members' PII and PHI.

123.    Nuance also understood and appreciated that the PII and PHI pertaining to Plaintiff and Class Members was private and confidential and its value depended upon Nuance maintaining the privacy and confidentiality of that information.

124.    In particular, Nuance enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII and PHI. Instead of providing a reasonable level of data security that would have prevented or mitigated the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective data security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Nuance's decision to prioritize its own profits over the requisite security.

125.    Nuance failed to secure Plaintiff's and Class Members PII and PHI, and therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

126.    But for Nuance's willingness to commit to properly and safely collecting, maintaining, and securing PII and PHI, such information would not have been transferred to and entrusted to Nuance. Further, if Nuance had disclosed that its data security practices were inadequate, Nuance would not have gained the trust of its clients.

127.    Nuance's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the collection, maintenance, and inadequate security of Plaintiff's and Class Members' PII and PHI, while at the same time failing to securely maintain that information from unauthorized access and compromise.

128.    Plaintiff and Class Members have no adequate remedy at law.

129.    Under principles of equity and good conscience, Nuance should not be permitted to retain any money derived from its acquisition and collection of PII and/or PHI, or the PII/PHI belonging to Plaintiff and Class Members.

130.    As a direct and proximate result of Nuance's wrongful conduct, Plaintiff and Class Members have sustained damages as described in this Complaint.

131.    Plaintiff and Class Members seek an Order of this Court requiring Defendant to refund, disgorge, and pay as restitution any profits, benefits and other compensation obtained by Defendant, through its clients, from its wrongful conduct and/or the establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

### THIRD CAUSE OF ACTION
### DECLARATORY JUDGMENT
### (On Behalf of Plaintiff and the Class)

132.    Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

133.    Plaintiff brings this claim individually and on behalf of the Class.

134.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described in this Complaint.

135.    An actual controversy has arisen in the wake of the Data Breach regarding Defendant's common law and other duties to act reasonably with respect to safeguarding the data of Plaintiff and the Class. Plaintiff alleges Nuance's actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiff and the Class continue to suffer injury due to the continued and ongoing threat of additional fraud against them or on their accounts.

136.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendant owed and continues to owe a legal duty to secure the sensitive information with which it is entrusted, and to timely notify impacted individuals of the Data Breach under the common law, Section 5 of the FTC Act, and HIPAA;

b.    Defendant breached, and continues to breach, its legal duty by failing to employ reasonable measures to secure Plaintiff's and Class Members' PII and PHI; and

c.    Defendant's breach of its legal duty continues to cause harm to Plaintiff and the Class.

137.    The Court should also issue corresponding injunctive relief requiring Defendant to employ adequate security protocols consistent with industry standards to protect individuals' (*i.e.*, Plaintiff's and the Class's) data.

138.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendant's data systems. If another breach of Defendant's data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

139.    The hardship to Plaintiff and the Class if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

140.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for relief as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C.    For damages in an amount to be determined by the trier of fact;

D.    For an order of restitution and all other forms of equitable monetary relief;

E.    Declaratory and injunctive relief as described herein;

F.    Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

G.    Awarding pre- and post-judgment interest on any amounts awarded; and

H.    Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

A jury trial is hereby demanded for all claims so triable.

Dated: October 2, 2023                    Respectfully submitted,

_/s/Jonathan M. Jagher_
Jonathan M. Jagher
**FREED KANER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
610.234.6486
jjagher@fklmlaw.com

Joseph E. O'Connor*
**O'CONNOR & PARTNERS, PLLC**
255 Wall Street
Kingston, New York 12401
T: 845-303-8777
T: 845-303-8777
JOConnor@onplaw.com

Gary F. Lynch*

35

Nicholas A. Colella*
Patrick D. Donathen*
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Facsimile: (412) 231-0246
gary@lcllp.com
nickc@lcllp.com
patrick@lcllp.com

Alan M. Feldman*
Zachary Arbitman*
Samuel Mukiibi*
**FELDMAN SHEPHERD
WOHLGELERNTER TANNER
WEINSTOCK & DODIG, LLP**
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
T: (215) 567-8300
F: (215) 567-8333
afeldman@feldmanshepherd.com
zarbitman@feldmanshepherd.com

*pro hac vice* forthcoming

*Attorneys for Plaintiff*